IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 29, 2003 Session

## STATE OF TENNESSEE v. ALEJANDRO RIVERA

**Direct Appeal from the Circuit Court for Cocke County
No. 7144     Ben W. Hooper, II, Judge**

_____

**No. E2002-00491-CCA-R3-CD
December 1, 2003**
_____

The Cocke County Grand Jury indicted the Defendant for first degree premeditated murder pursuant to Tennessee Code Annotated section 39-13-202 (1997). After a trial, the jury convicted the Defendant of the indicted charge and then sentenced him to life in prison with the possibility of parole. The Defendant appeals contending that: (1) the prosecutor made improper statements to the jury; (2) the trial court improperly admitted into evidence two pieces of evidence and statements of his co-defendants; (3) the trial court erred when it refused to grant his request for a continuance; (4) the trial court erred when it refused to grant him a judgment of acquittal; (5) the trial court erred when it instructed the jury; (6) the voir dire was improper; (7) the trial court erred when it refused the Defendant's request to change venue; (8) the trial court erred when it refused to admit drawings made by a key prosecution child-witness; (9) the trial court erred when it allowed two witnesses to remain in the courtroom for the duration of the trial; (10) the trial court erred when it refused to consider evidence regarding statements allegedly made by the jury foreman; (11) the trial court erred when it refused to allow a New York search warrant and affidavit to be admitted into evidence; (12) the trial court erred when it allowed a photograph of the deceased to be admitted into evidence; and (13) the trial court erred when it did not review the "TBI file." Finding no error in the judgments of the trial court, we affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Carl R. Ogle, Jr., Jefferson City, Tennessee, and Tim S. Moore, Newport, Tennessee, for the appellant, Alejandro Rivera.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; Alfred C. Schmutzer, Jr., District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the killing of Jonathan Aaron Smith ("Aaron Smith" or the "victim") on July 23, 1997. The State asserted that the victim's wife, Denice Smith, and her twin sister, Deborah Graham, hired the Defendant to kill the victim, which he did with the assistance of Deborah Graham.[1] At the time of the murder, the victim and Denice Smith were recently divorced, and a few days before the murder, on July 17, 1997, the court entered an order granting the victim custody of the couple's two minor children, Brittany and Joshua. Based upon this theory and supporting facts, the Cocke County Grand Jury indicted the Defendant for premeditated first degree murder. Following a jury trial in the Cocke County Circuit Court, a jury convicted the Defendant of first degree murder, and the trial court sentenced him to life in prison with the possibility of parole.

Because one issue that the Defendant appeals is whether sufficient evidence exists to convict him of premeditated first degree murder, we must summarize the evidence presented at trial. At trial, the State offered testimony from Sharon Jarvis, Sharon Michael Strange, and Christine Latham Loveday, who all testified that Denice Smith sought to kill her husband. Jarvis testified that she was a day-care worker who watched Denice Smith's children between June and August of 1996. Jarvis testified that, during that time, Denice Smith confided in Jarvis that she and the victim were getting a divorce and that she did not want him picking up the children. Jarvis stated that Denice Smith told her that she was concerned that the victim would get custody of the children and on three occasions told her that, if the victim did get custody, she would kill him. On cross-examination, Jarvis testified that Denice Smith told her that there had been some physical confrontations between the victim and herself and that the son, Joshua, had Down Syndrome. Jarvis also stated that Denice Smith told her that on one occasion she had her daughter Brittany assist her in "break[ing] into the house where [the victim] was staying" to retrieve items.

Sharon Michael Strange testified that she was the manager of a tanning salon that Denice Smith frequented from May of 1997 to July of 1997. Strange testified that Denice Smith told her that she had marital problems and was going through a divorce from her husband, Aaron Smith. Strange stated that Denice Smith told her that the couple was battling for custody of the children. Strange testified that, on one occasion, Denice Smith asked her if "I knew anybody [who] could do a job for her? And I asked her what kind of job that she wanted done, and she said that she would like to have [her] husband taken care of . . . ." Strange testified that, after Denice Smith told her that she wanted her husband killed, Strange told her that she needed "to be careful who she was talking to, and that she could get in a lot of trouble." Strange testified that Denice Smith did not mention the marriage again for the next couple of weeks but brought pictures to show Strange that the children had been abused by the victim. Strange stated that, at some point, Denice Smith called her and told her that the court awarded the victim custody of the children and that she was going to take

[1]The sisters were found guilty of first degree murder and were sentenced to life imprisonment with the possibility of parole. That conviction was affirmed by this court in State v. Graham, No. E1999-02248-CCA-R3-CD, 2001 WL 301160, at *16 (Tenn. Crim. App., at Knoxville, Mar. 29, 2001), and the sisters' applications for permission to appeal to the Tennessee Supreme Court were denied on September 17, 2001.

the "kids [to Florida] and run with them, and that if she had to kill him in the process, that she would." On cross-examination, Strange testified that Denice Smith told her that the victim physically abused her and her children. She also testified that Denice Smith told her that the victim stuck a pencil lead in Joshua's leg.

Christine Loveday testified that she worked with Denice Smith at a dentists' office and that Denice Smith discussed her marital problems with her. Loveday testified that Denice Smith told her more than once that if her husband ever got custody of the children, she would kill him or have him killed. Loveday stated that Denice Smith told her that she would leave the country with the children before she would allow her husband to have custody of the children. Loveday testified that, five days before she heard that the victim was killed, she saw Denice Smith at the dentists' office and noticed that her truck was loaded down and that Denice Smith's father was with her. Loveday testified that, when she asked Denice Smith where she was going, Denice Smith said that "she couldn't tell us, and that we didn't want to know."

Charles Jackson Snyder testified that he was an employee of the Gatlinburg Post Office and that he was employed there on July 15, 1997. Snyder reported that, while working at the post office on July 15, 1997, he received a phone call from "Carl Sanders who said he was from Bismarck, North Dakota." Snyder stated that Sanders informed him that an express mail package addressed to Aaron Smith was going to arrive and that the package contained drugs. Snyder testified that he gave this information to his supervisor, who contacted the Postal Inspector from Knoxville, Russell F. Fallis. Snyder stated that, subsequently, the package arrived and was given to Fallis.

Fallis testified that, after learning that the package might contain drugs, he decided to pose as a postal carrier and deliver the package to the victim with the assistance of Randy Parton and Rickie McMahan from the Fourth Judicial District Task Force. Fallis testified that the package indicated that it was from Atlanta, and, after he delivered it to the victim, the victim opened it on the street, which was relatively crowded. Fallis stated that, after the Task Force officers showed the victim their credentials, the victim stated that he had been "set up." Fallis testified that after the officers approached the victim and explained that they suspected that the package contained drugs the victim consented to allow the officers to open the package in front of him. The package contained two bags of what appeared to be drugs and an envelope that read, "To Aaron Smith. Next time the price goes up."

Fallis testified that they did not arrest the victim because it did not appear that he was aware that this package contained drugs. Fallis stated that he later learned that the package originated in Miami, Florida, and not in Atlanta, as the return address indicated. Fallis testified that he requested an inquiry by the postal inspector in Miami. Fallis also testified that he sent the contents of the package to the crime lab to determine if any latent fingerprints were present on the items, and the lab determined that the fingerprints of Deborah Graham were on the items. On cross-examination, Fallis testified that the victim told him that Deborah Graham was heavily involved in drugs and that he suspected that she sent him the package.

-3-

Carl Smith, a forensic scientist for the Tennessee Bureau of Investigation ("TBI"), testified that the substance contained in the two bags in the package weighed 0.14 grams and was tested and confirmed to be cocaine.

The State filed the Memorandum Opinion entered by the Circuit Court for Cocke County in the case of Jonathan Aaron Smith versus Denice Smith filed on July 17, 1997, which granted custody of the couple's children to the victim.

Harry T. Smith, the victim's father, testified that he lived on a campground called Camp Acres, which he owned at the time of the victim's murder. Harry Smith testified that Camp Acres was only accessible by an electric gate that required a card for entry. The only people who had cards were "lot owners" who either owned or rented a lot. Harry Smith testified that Denice Smith had one of those cards. He stated that the victim lived in a house on Camp Acres for some time with his wife, Denice Smith, and their two children. Harry Smith testified that Denice Smith and the victim were married for twelve years before they began to have marital problems that led to the couple filing for divorce. Harry testified that, when the couple separated, the victim moved into Harry Smith's house and that the children remained with Denice Smith in the couple's house.

Harry Smith testified about the day of the murder, July 23, 1997. Harry Smith testified that on that day he was fixing the road down by the gate to Camp Acres. He stated that at 3:30 p.m. he went back to the house to shower and change clothes, and at about 4:20 p.m. he left his house to get something to eat. Harry Smith testified that the victim was not home at this time. Harry Smith testified that he came back to the house around 6:00 p.m., and, at that time, he saw his son laying on his side in front of the house. He explained that his son appeared to have been shot. Harry Smith testified that he went in the house, which looked as if it had been ransacked, and called 9-1-1. Harry Smith noticed that the return air vent was open and "laying down," and he thought that it was unusual because he used to keep money behind the return air vent, a fact of which Denice Smith was aware. Harry Smith testified that there was a pair of handcuffs on a chair in the house, and a gun, that belonged to him, laying under the table. Harry Smith testified that he noticed that a box containing some old coins, pocket watches, a "railroad watch" and a "24 karat gold nugget watch" was missing from a cabinet in the garage. He stated that a gun and gun case were also missing from the cabinet. He also said that the only room in the house that was not "ransacked" was the room upstairs where his son was living, but that the rifles that he stored in that room were on the floor.

Harry Smith testified that the last time that he saw Denice Smith was the day after the divorce was final and custody was granted to the victim. Denice Smith and her father loaded up a truck, put Brittany and Joshua in the car and left. Harry Smith testified that he thought that she and her father were leaving, but his wife suggested that they were only going to an appointment.

Robert Caldwell, Chief Detective with the Cocke County Sheriff's Department, testified that he investigated the victim's murder on July 23, 1997. He testified that, when he arrived at the scene, he found the victim's body on the sidewalk leading to the residence. Detective Caldwell testified that he requested assistance from the TBI. On cross-examination, the Detective testified that he

made an affidavit to the court stating that his file indicated that there were pictures of four suspects faxed to him, including a picture of the Defendant, and that Brittany, the victim's daughter, did not identify any of the suspects. However, the Detective stated that, after he reviewed his file in preparation for the trial, he found that Brittany did identify the picture of one of the suspects, Harry Hodges, as somebody named George that she saw in a motel in Florida.

Dr. Cleland Blake, the Assistant State Chief Medical Examiner with the TBI, testified that he performed the autopsy on the victim. Dr. Blake testified that there were three gunshot wounds to the victim: one bullet went through his right ear and was from a gun fired from in front of the victim; another bullet entered the back of his head and exited the front of his forehead and was fired from a gun behind the victim; and another bullet entered his back and exited his right chest area and was fired from a gun behind the victim. The doctor testified that the bullet that entered the victim's head was "an instantly lethal wound."

Kelly Smith, who was with TBI at the time of the murder investigation, testified that she was the team leader of the team responsible for the forensic investigation of the murder. She testified that when she arrived at the scene of the murder at around 11:00 p.m., the victim's body had already been removed. Agent Smith stated that, during the course of her investigation, she found a spent bullet and several reddish-brown stains both inside and outside of the house. She also testified that she found handcuffs inside the house and that inside the house there were "clothes and other material that had been strewn throughout the house, and it was not orderly at all." Agent Smith stated that she noticed that a vent had been pulled away from the wall and found a gun lying on the floor. Agent Smith testified that she also found several pieces of jewelry, including a watch, an earring and an earring back. The parties stipulated that no blood was found on either the earring or the earring back. Agent Smith testified that she went upstairs and found "a number of weapons on the floor."

The parties stipulated that Mark Squibb, with the Tennessee Crime Laboratory, found that the reddish-brown stains found at the crime scene were human blood. The parties also stipulated that Boyd Gene Phillips, a Latent Fingerprint Examiner with the TBI Forensic Service Division, found no readable fingerprints on the gun or at the crime scene other than the fingerprints of the victim. Additionally, the parties stipulated that Robert Royce, a firearms examiner with TBI, analyzed the spent bullet found at the crime scene and found that it came from the gun belonging to Harry Smith that was found at the crime scene.

Brittany Smith testified at trial that her parents were the victim and Denice Smith and that she had one brother, Joshua Smith. Brittany Smith testified that, at the time of trial, she was fourteen and her brother was twelve. At the time of her father's murder, Brittany Smith was ten and her brother was eight. Brittany Smith testified that, before the murder, her parents were going through a divorce and that, at that time, she and her brother lived with her mother at Camp Acres. She explained that her father, the victim, lived up the hill from her mother's house with his parents. Brittany Smith stated that when her mother found out that "[her] dad had custody, we left town" with Joshua and her mother's father, Don Graham. Brittany Smith testified that they left town in two vehicles, her mother's Mitsubishi Montero and her grandfather's Chevrolet truck. Brittany Smith

stated that, before they left town, they went to her mother's workplace to get her mother's paycheck, and then "we went to the bank, and I guess she got her check cashed, and then we went to Newport to her attorney's office, and then we left town." Brittany Smith testified that, upon leaving town, they went to Miami, Florida, driving "straight through."

Brittany Smith testified that once in Miami they met her "Aunt Debbie," who was Deborah Graham, and "some other people" at "a little like bar stand behind the Golden Nugget." Brittany Smith testified that "[Deborah Graham], my grandfather, Don [Graham], my mom, two people named George, and Alex" were present at the meeting. She described "Alex" as "tall . . . real slender. He shaved his head, he had small glasses, dark skin, a beard and a mustache, tattoos." She described the tattoos as "a eagle and a dragon." Brittany Smith then identified "Alex" as the Defendant. Brittany Smith testified that Deborah Graham took her and her brother to the beach while the others stayed behind and talked. She stated that, later, they went to their motel, "The Driftwood," and "unpacked, and stayed there." Brittany Smith testified that she, Don Graham, her mother and little brother, stayed in room number 321 at the motel.

Brittany Smith testified that, the day after they arrived, her mother rented a white car from a dealership and Deborah Graham, the Defendant and "both of the Georges" left in the car. Brittany Smith testified that two or three days later, late at night, Deborah Graham, the Defendant and "one of the Georges" came back to the motel. She testified that she was supposed to be asleep on the floor, but she was not and overheard the conversation in the motel room. She stated that she heard Deborah Graham tell her mother and Don Graham "that they hurt someone bad, and I heard [the Defendant] say, 'no, we've killed someone,' and my mom said, 'yeah, and it was easy, too.'"

Brittany Smith testified that, right before the Defendant left on the trip, he had handcuffs in his back pocket, which she could identify because she could see the "bottom part of the chain hanging out over the pocket." Brittany Smith stated that, when the Defendant returned that evening, the Defendant did not have the handcuffs with him. Brittany Smith stated that, when Deborah Graham returned, she was wearing "my mamaw's [Cleta Smith's] pink ice ring" and that the Defendant had "my papaw's [Harry Smith's] gold nugget watch, and my dad's Swiss Army knife."

Brittany Smith testified that, one or two days after she overheard the conversation, she left with her mother, Don Graham and her brother, Joshua, to go to Michigan to her "Aunt Marion's" house. She explained that "Aunt Marion" was the wife of Don Graham's brother. Brittany Smith stated that once they arrived at "Aunt Marion's" house, she learned that her father had been killed at Harry Smith's home. Brittany Smith testified that they stayed in Michigan until "Aunt Marion" brought her and her brother back to Tennessee. Brittany Smith testified that she was only in Michigan for "one and a half to two days" before her aunt brought her back to Tennessee.

On cross-examination, Brittany Smith testified that the lights were off when she heard the conversation about the "killing." Brittany Smith stated that, when they left the Driftwood motel, they stored some boxes at a "storage place" to keep them from being in the back of Don Graham's truck.

The parties stipulated that Alamo Car Rental records showed that Denice Smith leased a white Buick Regal with Florida license tag number UVN79B on July 21, 1997. The car was returned on July 28, 1997, and it had accumulated 2,476 miles.

Vernon Brown testified that he and his wife owned a lot in Camp Acres and that they were living in a motor home on that lot during the summer of 1997. He testified that, on July 23, 1997, he saw two people sitting near a car, one of them a woman with blonde hair. Brown testified that, a short time later, he saw a man knocking on Harry Smith's house, where the victim lived. Brown testified that, while he did not get a good look at the man, he looked like he had a slender build and black hair. Brown also testified that there was a white car parked nearby that caught his attention because he did not think it was supposed to be there. After returning to his motor home a few minutes before 5:00 p.m., Brown heard three gunshots, but did not think it was that unusual because there are many hunters in the area. Brown testified that shortly after 5:00 p.m. he heard a car "leaving in a hurry, like a speeding car." Brown then recognized a picture of tire marks where someone apparently left in a "hurry." On cross examination, Brown testified that he told the TBI agents that the man he saw knocking on the door was "skinny, white male with long hair, wearing a ball cap."

Ed Pulley, a state trooper with the Tennessee Highway Patrol, testified that he was working on July 23, 1997, and he issued a citation to "David Antonio Rivera" for speeding. Trooper Pulley testified that he "clocked" the white four door 1996 Buick traveling south on 1-75 near mile marker 46 at eighty miles per hour. He explained that the car had Florida license tag number UVN79B, and riding in the car were a male driver, who produced his drivers' license, and a woman in the front seat. Trooper Pulley testified that, after stopping the car, he would have checked the drivers' license of the person driving the vehicle to ensure that the picture matched the driver presenting the license, but could not identify the Defendant in court. The trooper testified that the address listed on the license was "2560 Northwest 67th Street, Miami, Florida, 33147," and the drivers' license number was "R160161591390."

Ronald Raccioppi, who was an officer with the Florida Department of Law Enforcement, testified that he traced the license tag number given to him by police officials in Cocke County, which they believed was related to a suspect named "Alex," and it came back to a rental car registered to LaShawn Taylor. Officer Raccioppi testified that he obtained Taylor's address, 6750 Northwest 67th Street, from the rental car agency, and he began surveillance of that location. He stated that, when the officers stopped Taylor's vehicle, it was occupied by Taylor, who was driving, and by a man who produced identification that stated that his name was "David Rivera." Officer Raccioppi later identified "David Rivera" as the Defendant. The officer asked the Defendant if his name was "Alex" and he said "no." The officer then identified a copy of the drivers' license showing the name "David Antonio Rivera" and the address as 6750 Northwest 67th Street.

Officer Raccioppi testified that the Defendant then voluntarily went with them to the police station to discuss a "homicide in Tennessee." The officer testified that he read the Defendant his rights, and that the Defendant waived those rights. Officer Raccioppi testified that, at the police

station, he noticed visible tattoos on the Defendant, one of which was "an eagle on the rising sun" on the upper left shoulder and the other was a "tattoo of a tiger" on the backside of the same arm. Officer Raccioppi testified that the Defendant refused to show the rest of his tattoos. The officer testified that during the interview the Defendant stated that he met Deborah Graham in New York about five years ago, but had not spoken with her for three years until she contacted him "about a month and a half ago" after speaking with a mutual friend "Alex Rios." Officer Raccioppi testified that the Defendant stated that he did not have a cell phone number for Deborah Graham, but that she would call his beeper. The officer testified that the Defendant stated that Deborah Graham stayed at "the Golden Strand and the Fountain Head motels" while in Florida. Officer Raccioppi testified that the Defendant told him that Deborah Graham never stayed at the Driftwood motel, but that George Penta, with whom Deborah Graham was intimate, stayed at that motel. The officer reported that the Defendant stated that he "wasn't allowed [at the Driftwood motel]."

Officer Raccioppi testified that the Defendant told him that he went to Tennessee about three weeks ago with another man when he was driving to Michigan. The officer testified that the Defendant told him that he was traveling in a white rental car and that he did not want to say who rented it. Officer Raccioppi stated that the Defendant told him that the vehicle was rented from "Value Rental" in "Fort Lauderdale." The officer testified that the Defendant denied ever meeting anyone in Deborah Graham's family, including her father, sister, or niece and nephew. The officer testified that when he asked the Defendant, "who is Alex?" he responded, "Alex Rios, a friend of ours from New York." Officer Raccioppi stated that, later in the interview, the Defendant said, "Look, I told you my name is Al – David."

Officer Raccioppi testified that after he told the Defendant the evidence they had in the case, including the fact that they had the white car, the Defendant "changed his story." The officer testified that the Defendant stated, "I plead the Fifth to driving a white car" and admitted that he drove with Deborah Graham to Michigan and that he was not with another male. Officer Raccioppi stated that the Defendant stated that Deborah Graham had a job interview in Michigan, but he could not remember the name of the city where the two went. The officer testified that the Defendant stated that "we stayed with a friend named Gilda Hart, a black woman . . . who lives in a red brick house." Officer Raccioppi stated that he then questioned why, if the Defendant and Deborah Graham went to Michigan, were there only 2400 or 2800 miles on the car, and the Defendant responded, "that's a lot of miles. Go ahead and check; you'll see it's enough to get there and back, and more."

The officer testified that, at the end of his conversation with the Defendant, the Defendant said that he would contact Deborah Graham and get her to talk to the police, and, thereafter, the officer drove him to Taylor's place of work. Officer Raccioppi testified that later that same day the Defendant paged him, and when the officer called him back the Defendant told him the location of Deborah Graham's interview in Detroit, Michigan, and gave the officer the street on which Gilda Hart lived. The officer testified that he was unable to contact the Defendant again.

Officer Raccioppi also testified that the post office from where the package containing drugs was sent to the victim was located 300 yards from the Defendant's home. The officer also testified that the number on the drivers' license produced by the Defendant matched the drivers' license number that was listed on the citation issued by the Tennessee State Highway Patrol.

On cross-examination, Officer Raccioppi testified that he knew that the witnesses at the scene reported that there was a white male knocking on the door of the victim's home before they heard a gunshot. The officer testified that the investigation revealed that the Defendant's brother was "David Rivera." Officer Raccioppi stated that during the course of the investigation it was discovered that there was a storage unit in the name of "David Rivera," to which a person named "Debbie Giovi" had access. The officer stated that, in the storage unit, the officers found "boxes of toys, furniture, [and] photos."

The State then entered a copy of the record of the Driftwood Resort Motel from July 18, 1997, to July 23, 1997, for room number 321 showing that it was rented to Don Jones.

Harold David Hutchinson, a criminal investigator with the District Attorney's Office, testified that he was involved in the investigation of the victim's murder. He testified that he was unable to confirm that Deborah Graham had an interview at Fox Studios in Detroit. Hutchinson stated that he attempted to find Gilda Hart, who allegedly lived on West Grant Avenue in Detroit, but he was unable to find her. Hutchinson testified that the mileage for a round trip from Miami, Florida to Detroit, Michigan and back was 2,788 miles. He stated that the milage from a round trip from Miami, Florida to the Cosby, Tennessee was 1,882 miles, and the mileage from Camp Acres to mile marker number 46 was 112 miles. On cross-examination, the investigator testified that he cleared Harry David Hodge as a suspect because the investigator was unable to place him in Tennessee at the time of the murder.

LaShawn Taylor, the mother of the Defendant's son and long-time girlfriend, testified that she was introduced to Deborah Graham by the Defendant. Taylor testified that the Defendant and Deborah Graham left town together, and it was her understanding that they drove to Michigan for a job interview. Taylor stated that, after they left, she received a phone call from the Defendant, and he said they were in Tennessee helping Deborah Graham's sister move out of her house. Taylor testified that the two were gone for three days or more after which the Defendant came back to her home. Taylor testified that, later, Deborah Graham came to the home driving a white car, and the Defendant told her to "get the car out of here" or "get in the car and get out of here," and she left. Taylor testified that she saw Deborah Graham again when she came to Taylor's house to spend the night "because she didn't have anywhere else to sleep." Taylor stated she remembered that one night the Defendant and Deborah Graham were talking and that, every time Taylor entered the room, the talking would stop. Taylor testified that one day she took Deborah Graham to the airport, and Deborah Graham said she was going to New York.

Taylor also testified that, on the day that she and the Defendant were stopped by the police, the Defendant produced false identification in the name of "David Rivera." Taylor stated that, after

the Defendant was with the police, he came to her work and got her car and then, at the end of her work day, the Defendant picked her up and took her to her mother's house. Taylor testified that the Defendant left her at her mother's house and said he would be "right back," but he never returned. The next time she saw the Defendant was the day of trial, but she had spoken with him and told him the police were looking for him. Taylor testified that she and the Defendant went to a pawn shop "on 79th Street." She said that, at the pawn shop, the Defendant retrieved some items of jewelry that were pawned. One piece that he retrieved was a "Noah's Ark bracelet."

On cross-examination, Taylor testified that she was jealous of Deborah Graham's relationship with the Defendant and that she suspected that they were having an affair. She also testified that the Defendant never told her that he was involved in any murder and that he was worried that because of his race the police in Tennessee would not believe his story.

Robert Cecil Latta, Sr., who was employed by the Cash In Pawn Shop in July of 1997, testified that his records showed that on July 24, 1997, "David Antonio Rivera" pawned an Elgin non-gold pocket watch, a 10 karat Noah's Ark bracelet, two women's free form rings, and a Nikon camera, Model ZT400. Latta testified that his records indicated that on August 7, 1997, "David Rivera" retrieved the items that he pawned. Latta produced from his records a photocopy of the state issued I.D. of "David Rivera."

Martin Kevin Giovi testified that he used to be Deborah Graham's boyfriend in 1994 and that, during their relationship, Deborah Graham mentioned that her sister, Denice Smith, was having marital problems because her sister's husband was abusing the kids. Giovi testified that Deborah Graham requested that he "go down there and kill him" on three or four occasions. Giovi testified that he went to jail and, upon his release in 1997, he and Deborah Graham began living together again in New York. Giovi stated that Deborah Graham told him that she was involved in the victim's murder. Giovi testified that, when the police came to arrest Deborah Graham, he gave Detective Paul Dotzler a bag of jewelry that Deborah Graham had given to him. On cross-examination, Giovi admitted that he had multiple criminal convictions.

Paul Dotzler, a detective with the Port Authority Police Department in New York/New Jersey, testified that he assisted Miami officers in locating and arresting Deborah Graham. He testified that Deborah Graham left a piece of luggage at the airport and that, from the luggage, they learned of her current New York address. The detective testified that when Deborah Graham was arrested at her New York address Giovi gave the detective a bag of jewelry that he said Deborah Graham had hidden in his house.

Cleta Mae Smith, the victim's mother, testified that, when she returned to the house after her son was murdered, she found that every drawer was taken out and "everything was [thrown] everywhere." The State then showed her the bag of jewelry that Giovi gave to Detective Dotzler, and Cleta Mae Smith identified it as all hers and that, much of it, she made herself. Further, Cleta Mae Smith testified that, after the murder, she noticed that she was missing her "Noah's Ark" bracelet, a Nikon camera, and a "big pink ice ring."

Gilbert Ramirez, a detective with the New York City Police Department, testified that he arrested the Defendant in connection with this murder. Detective Ramirez testified that, when the Defendant was arrested, he said his name was "Jonathan Rivers" and showed a drivers' license from the Virgin Islands that confirmed this name. The detective stated that, while in custody, the Defendant said, "F---ing B---es set me up" and "Someone's going to die over this s---." Detective Ramirez testified that the Defendant also said, "I narrow it down to five. I got five now on my list. I'll make it look like a robbery." The detective testified that the Defendant also said, "I got the piece of the puzzle. I bet they didn't say their dad was involved." The detective explained that, when he arrested the Defendant, he noticed some tattoos on him and found a handcuff key on his person. Detective Ramirez testified that the handcuff key did not fit the handcuffs found at the scene of the murder.

Detective Ramirez testified that it was "a couple of days" before the Defendant allowed his fingerprints to be taken. Ramirez then identified pictures of the Defendant's tattoos. The first was on the Defendant's chest and was a dragon. The next was on the back side of his left arm and was a big eagle.

In his defense, the Defendant called Eric Rodriguez, who testified that he worked at Dezer Properties, which owned the Driftwood Hotel. Rodriguez testified that the records indicated that Don Jones checked in to the Driftwood on July 18, 1997, and that he checked out on July 23, 1997, at 11:34 a.m. Rodriguez testified that he had never met, nor had he ever seen, the Defendant. On cross-examination, Rodriguez testified that he was not sure whether Dezer Properties owned the Driftwood hotel in 1997 and that he was not working at the Driftwood at that time.

Marion Graham testified that she was Don Graham's sister-in-law and Deborah Graham's and Denice Smith's aunt. Marion Graham testified that, during the afternoon of July 24, 1997, she learned that the victim was killed from he niece Jennifer Gainer. She stated that, on that same day at around 6:00 p.m. or 6:30 p.m., Denice Smith called her, and then, at approximately 12:30 a.m., Denice Smith arrived at Marion Graham's house with Don Graham, Brittany Smith and Joshua Smith. Marion Graham testified that Deborah Graham called her earlier that evening and gave her a phone number in Florida to give to Don Graham when he got to Marion Graham's house. Marion Graham stated that she gave Don Graham the number, and Marion Graham's phone records showed that at 1:04 a.m. a call was placed from her house to Florida that lasted forty-eight minutes. Marion Graham testified that, when Deborah Graham called her, she sounded hysterical and she was asking, "Where's my dad? He's gone, he's checked out, he's not here. Have you heard from him? Where did they go." Marion Graham told Deborah Graham that she had spoken with both Don Graham and Denice Smith.

Marion Graham testified that the victim's children, Brittany Smith and Joshua Smith, stayed with her for a day or two until she brought them back to Cocke County. Marion Graham testified that Denice Smith had already gone back to Cocke County. Marion Graham testified that, in the days that she was with Brittany Smith and Joshua Smith, Brittany Smith talked about her feelings

about the victim's death, but did not mention any conversation that she might have overheard regarding the death.

Jennifer Gainer testified that she was Don Graham's daughter and Denice Smith's and Deborah Graham's sister. She testified that, when she heard about the victim's death, she called her aunt, Marion Graham. She testified that Deborah Graham called her and that she was "hysterical" and looking for Don Graham. Gainer stated that she and Marion Graham called each other multiple times that day.

The jury found the Defendant guilty of first degree murder and sentenced the Defendant to life in prison with the possibility of parole. The Defendant filed a timely motion for new trial, which the trial court denied. The Defendant now appeals contending that: (1) the prosecutor made improper statements to the jury; (2) the trial court improperly admitted into evidence two pieces of evidence and statements of his co-defendants; (3) the trial court erred when it refused to grant his request for a continuance; (4) the trial court erred when it refused to grant him a judgment of acquittal; (5) the trial court erred when it instructed the jury; (6) the voir dire was improper; (7) the trial court erred when it refused the Defendant's request to change venue; (8) the trial court erred when it refused to admit drawings made by a key prosecution child-witness; (9) the trial court erred when it allowed two witnesses to remain in the courtroom for the duration of the trial; (10) the trial court erred when it refused to consider evidence regarding statements allegedly made by the jury foreman; (11) the trial court erred when it refused to allow a New York search warrant and affidavit to be admitted into evidence; (12) the trial court erred when it allowed a photograph of the deceased to be admitted into evidence; and (13) the trial court erred when it did not review the "TBI file."[2]

## II. Pre-trial Rulings

The Defendant argues that the trial court erred when ruling on several of his pre-trial motions. First, the Defendant contends that the trial court erred when it refused to grant his motion for a continuance. Second, the Defendant contends that the trial court erred when it denied his motion for change of venue. Lastly, the Defendant contends that the voir dire was improper.

### A. Motion for Continuance

The Defendant contends that the trial court erred when it denied his request for a continuance, but does not cite where in the record he made this motion. The State contends that this issue is waived because there was no formal motion for continuance filed. A thorough review of the record revealed multiple motions for continuance, all of which were granted by the trial court, save one. We presume that the Defendant appeals the motion for continuance that he filed under seal on February 23, 2001, which the trial court denied, and now address this issue on appeal.

---

[2]Issues (10), (11), (12) and (13), while raised in the Defendant's statement of the issues, were not mentioned in any other section of the Defendant's brief. Therefore, we hold that these issues have been waived. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7).

In the Defendant's motion to continue, the Defendant asserted that the State did not provide him with information regarding Harry David Hodge. Specifically, the Defendant contended that the State gave him a list of persons considered suspects at the preliminary stages of the investigation, which included a suspect identified as "George (last name unknown)," and then on February 21, 2001, the State provided pictures of the four people who Brittany Smith failed to identify on August 5, 1997, including a picture of Harry David Hodge. The Defendant alleged that the State called to inform the defense that, in preparation for trial, it realized that Brittany Smith did identify Hodge as being one of the "Georges," and that the Detective was mistaken when he testified that she had not identified any of the pictures. Upon this basis, the Defendant requested that the trial be continued so that his investigator could further investigate Hodge's involvement in this murder. Additionally, the investigator testified that he had already interviewed Hodge with relation to this case, but that, had he known that Brittany Smith identified Hodge, his approach in interviewing Hodge would have been different.

In response to the Defendant's motion for a continuance, the State filed a letter that the State furnished to the Defendant, which provided statements from both George Penta and Hodge. In this letter, the State underlined that these statements were provided as possible Brady material, specifically that these statements "conflict with the statement of [Brittany Smith]." Further, on cross-examination, the investigator admitted that in Hodge's statement, which the State provided to the defense, Hodge maintained that he did not know Deborah Graham and that he had not been to Tennessee recently. The investigator stated that from this he would have to assume that the reason Hodge was being asked about Tennessee was because he was a suspect of some sort. The investigator admitted that, even though the State may not have listed Hodge as a suspect, he "knew he had been treated as a suspect at some point by the government." Based upon this admission, the Court overruled the motion for continuance.

The granting of a continuance rests within the sound discretion of the trial court. State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995); Moorehead v. State, 219 Tenn. 271, 409 S.W.2d 357, 358 (1965); State v. Morgan 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). A reversal may only occur if the denial was an abuse of discretion and the defendant was improperly prejudiced in that a different result might reasonably have been reached if the continuance had been granted. Hines, 919 S.W.2d at 579; State v. Caughron, 855 S.W.2d 526, 534 (Tenn. 1993); State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. Hines, 919 S.W.2d at 579. The burden rests upon the defendant to show that the trial court's denial of the motion to continue was prejudicial. Baxter, 503 S.W.2d at 230.

The Defendant cites State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984), for the proposition that there are five factors that a court should consider when determining whether the trial court should have granted a continuance to interview or procure a defense witness. In Reynolds,

this court found "helpful" the five factors articulated in <u>Dickerson v. Alabama</u>, 667 F.2d 1364 (11th Cir. 1982). Those factors are:

> The first factor is the diligence of defense counsel in interviewing the witness and attempting to procure her attendance. The second factor is the probability of securing the testimony within a reasonable time. The third factor is the specificity of the person's expected testimony. The fourth factor is the degree to which the expected testimony is favorable to the defendant. The fifth factor is the uniqueness, or the cumulative nature, of the expected testimony.

<u>Reynolds</u>, 671 S.W.2d at 856. Based upon these factors, the Defendant contends that the trial court's denial of his motion to continue prejudiced him and constituted reversible error. Specifically, the Defendant asserts that it was his contention at trial that the meeting where the Defendant stated, "We've killed someone," about which Brittany Smith testified, never took place. The Defendant asserts that when he learned that Brittany Smith identified Hodge, "it became critical to the defense . . . to show that [Hodge], and for that matter [the Defendant], were not and could not have been present at the meeting Brittany Smith says occurred in the motel room after the killing."

We do not find the Defendant's contention persuasive. The Defendant's investigator testified that he interviewed Hodge and that he knew that Hodge had been treated as a suspect. He knew that the police questioned Hodge as to his whereabouts when the meeting allegedly occurred. Further, the Defendant was aware that Brittany Smith identified two Georges, and the State gave the Defendant a picture of Hodge as possible exculpatory evidence. While the investigator testified that he would have interviewed Hodge differently had he been aware that Brittany Smith identified Hodge, he still had the opportunity interview Hodge. According to the Defendant, "the interview clearly showed that [Hodge] was not present at any meeting where the death of [the victim] was discussed." This testimony is not specific or unique and, while it may have impeached Brittany Smith's testimony, it is not highly favorable to the Defendant. After a review of the entire record we do not find that the defendant failed to receive a fair trial or that a different result would or might reasonably have been reached if a continuance had been granted. Therefore, we conclude that the trial judge did not abuse its discretion when it denied the Defendant's motion for a continuance.

### B. Motion for Change of Venue

The Defendant contends that the trial court erred when it denied his motion for change of venue. When addressing this issue, the Defendant's brief, in its entirety, reads:

> It is the position of [the Defendant] that the court erred in refusing to change venue based upon publicity at the time of the commission of the crime, publicity surrounding the prior trial of Smith and Graham, and publicity prior to [the Defendant's] trial. This publicity took place through the newspaper, radio, and television. Based on the enormous amount of publicity it was impossible to get a juror who had not been exposed to this publicity, prior to trial.

The Defendant does not cite to the record or provide any citation to any legal authority. The State contends that the Defendant waived this issue and is correct that issues that are not adequately briefed are deemed waived. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also Tenn. R. App. P. 27(a)(7). Accordingly, we conclude that the Defendant has waived this issue.

## C. Voir Dire

The Defendant asserts that the "jury panel was illegal in that it contained at least five members, or their spouses of people who were on the grand jury which indicted Rivera." Further, the Defendant claims that three jury members should have been excused for cause, "two of those jurors were Marshall and Vick." The Defendant contends that "Juror Marshall indicated that he had read about the alleged perpetrator of this offense and had formed an opinion at the time he had read that and that the two sisters had secured [the Defendant] to kill [the victim]." We only address the Defendant's contention that "Marshall" and "Vick" should have been excused for cause since those are the only jurors whose name he provided in his brief. The Defendant has waived any other issue with any other juror by not providing the juror's name and not providing any citations to the record. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7).

Article I, section 9, of the Tennessee Constitution assures the accused in a criminal prosecution "the right, among other rights, to a speedy public trial . . . [by] an impartial jury." To ensure an impartial jury Tennessee Rule of Criminal Procedure 24 provides that the Defendant, or the State, may challenge a juror for cause. The Rules states:

> (B) Challenges for Cause. — If the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case. . . . Any party may challenge a prospective juror for cause if:
>
>  . . . . (2) The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an

opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.[3]

Tenn. R. Crim. P. 24. "The challenge for cause was designed to exclude from the jury [prospective jurors] whose bias or prejudice rendered them unfit . . . ." State v. Humphreys, 70 S.W.3d 752, 765 (Tenn. Crim. App. 2001) (quoting Manning v. State, 155 Tenn. 266, 292 S.W. 451, 455 (1927)). Juror qualification rests within the discretion of the trial court and "the trial judge's finding a juror to be qualified will not be disturbed on review except on the clear showing of an abuse of discretion." Humphreys, 70 S.W.3d at 765 (quoting Burns v. State 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979)); State v. Scarbrough, No. E1999-00931-CCA-R3-CD, 2001 WL 775603, at *9 (Tenn. Crim. App., at Knoxville, July, 2001), *perm. app. denied* (Jan. 7, 2002).

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented." State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961). Thus, so long as a juror can set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case. Id. In the case under submission, while Juror Marshall initially indicated that he had read in the newspaper about the murder and the Defendant's involvement, he also told the court that he could serve on the jury and decide this case based upon only the evidence that was produced in this case and the law.

---

[3]The comments to this rule state:

> A prospective juror who has formed or expressed an opinion as to the merits of the case may still be qualified to serve, but only upon an unequivocal showing of impartiality. The Commission disapproves of questions tending to lead the prospective juror or suggest partiality in the first instance, and also disapproves of that procedure in "rehabilitating" the prospective juror into vocalizing impartiality. Such a prospective juror should be held to be qualified only upon a truly unequivocal showing of impartiality.

Tenn. R. Crim. P. 24, Advisory Commission Comments.

[DEFENSE]: You've read the *Plain Talk*[4] . . . . stories about [the victim] , . . .back in July of 1997, Debbie Graham and Denise Smith, [and the Defendant].  Have you read anything in the *Plain Talk* that you recall about those individuals or these events.

. . . .

[MARSHALL]: I don't know if I read this or heard it.  Exactly what's in my mind that I heard or read? . . . Two sisters had him to do it or something or other like that.

[DEFENSE]: Did you recognize his name when . . . .

[MARSHALL]: It has been so long ago I'd forgotten

[DEFENSE]: Do you recall how long ago that was that you heard that?  Was it around the . . .

[MARSHALL]: It was around the time that it happened.

[DEFENSE]: Do you recall anything else about it?

[MARSHALL]: The father had custody of the children.

[DEFENSE]: Okay.  Anything else?

[MARSHALL]: I think that's about all I remember.

[DEFENSE]: Did you form any kind of opinion back when you heard that anywhere from that [the Defendant] wasn't involved in it, may have been a little involved in it, he was involved in it, did you form any opinion at that time?

[MARSHALL]: Well, anytime you read something in the paper you form an opinion, you know.

[DEFENSE]: What opinion did you form at that time?

[MARSHALL]: You automatically think what you read in the paper is true.

[DEFENSE]: I understand.  I don't mean to put words in your mouth at all, but based on what you recall reading did you form an opinion that [the Defendant] was or wasn't involved in it?

[MARSHALL]: Well, you think he is, I mean when you read something like that.

[DEFENSE]: Would it require some proof from the Defendant's side to change that opinion?

[MARSHALL]:  No, the burden of proof is on the State.

[DEFENSE]: Has anything happened between the time that you read that or heard it and I understand . . . that has changed your opinion in any way.

[MARSHALL]: My mind is open.

. . . .

[DEFENSE]: [I]s there anything that you know about yourself that would cause you any concern as far as your being able to be fair to both sides, the State and the Defendant?

[MARSHALL]: No.

. . . .

[THE COURT]: I want to ask a question or two, Mr. Marshall.  You kind of indicated some thought, opinion whatever came to your mind.  I'm not sure really whether it was an opinion.  But you now say you're open-minded but then you also

---

[4]*Plain Talk* is a newspaper that circulates locally in Cocke County and which carried stories of the murder.

said that really nothing had happened to change that thought or opinion if we call it that. And that raises a little bit of inconsistency. But I think I understood what you were saying. Are you saying that you read the newspaper or whatever, some thoughts came to your mind . . .

[MARSHALL]: Right

[THE COURT]: . . .now you have an open mind. Does that mean those thoughts are not there now?

[MARSHALL]: Yeah.

[THE COURT]: And then the final question, and you've served on juries before. Can you serve on this jury and decide this case based upon only the evidence that is produced in this case and then the law that I'll apply to that evidence?

[MARSHALL]: Yeah.

We hold that since Juror Marshall stated that the State had the burden of proof and indicated that he could serve on the jury and decide the case based upon only the evidence and the law, the trial court did not abuse its discretion in refusing to excuse Juror Marshall for cause.

While the State is correct that the Defendant waived the issue of whether the trial court erred when it refused to excuse Juror Vick for cause by providing no citations to the record or any argument, we briefly address this issue. During voir dire, the following questions were asked of, and responses given by, Juror Vick:

[DEFENSE]: Let's talk about the *Plain Talk.* What do you recall . . . [about] these events back in July of '97. . . .

[VICK]: I mainly just recall reading. I probably made comments, I don't know. That's too far back.

[DEFENSE]: Do you recall anything you read . . . .

[VICK]: Not in detail, no, I don't remember . . . .

[DEFENSE]: . . . As you sit there do you recall any of the details that you read?

[VICK]: I remember reading that a girl and her sister had hired someone to kill her husband. I don't remember the names, I just don't. . . .

[DEFENSE]: Do you recall any facts other than what you've just told us at any time as far as reading the paper is concerned?

[VICK]: I remember reading that the two girls went to jail. I don't remember the details.

. . . .

[DEFENSE]: . . . Do you recall forming any opinion of any type when you read what you read?

[VICK]: Probably yes.

[DEFENSE]: What opinion do you recall?

[VICK]: I would imagine that I believed part of what I read. I do not believe all of what I read. But I'm sure that I read enough to say this guy has killed so-and-so; oh, that's bad; or – I really, I don't know what you're expecting me to say . . . .

-18-

[DEFENSE]: Do you mean after you read what you read, and it may have been on more than one occasion, that you did or didn't form an opinion as to whether or not [the Defendant] did any killing?

[VICK]: I would imagine that yes, I thought by reading it that I would say yes, he did, you know.

[DEFENSE]: Has anything happened since then that has changed that opinion?

[VICK]: Being here changed it.

[DEFENSE]: How?

[VICK]: Because you've got to hear what's in the courtroom.

[DEFENSE]: Would you have to hear something to change that opinion?

[VICK]: If you're saying that I have formed an opinion and right this minute that I say, yes, he's guilty, I don't know that yet.

[DEFENSE]: Not exactly what I'm saying but I'm asking if it would take some evidence to overcome that prior opinion you formed?

[VICK]: I'd just have to hear what evidence is here to form an opinion either way.

[DEFENSE] Are you saying you don't have an opinion now?

[VICK]: Well, I would say that I am a fair person and that I would have to hear. Like you say, the State has to prove it, right? Okay. Like I said, I've been on enough cases to know that I've been disappointed when I left because it wasn't proven, I'm sorry, you know. But that's what I'm saying. Reading an article and you read and it's, like I say, it's a happening and it's over, you don't think about it. But then when you're brought down here and you're put in a position to where you have to judge it makes a difference.

From this transcript, we hold that the trial court did not abuse its discretion when it refused to excuse Juror Vick for cause. While Juror Vick mentioned that she read an article in the newspaper, she clearly understood her duty as a juror to hear the evidence presented and to decide the case on that evidence alone.

### III. Evidentiary Issues

The Defendant contends that the trial court improperly admitted, and refused to admit, multiple pieces of evidence and testimony. First, the Defendant contends that the trial court improperly admitted a handcuff key into evidence that was found on him when he was arrested. Second, the Defendant contends that the trial court erred when it admitted pictures of his tattoos into evidence. Third, the Defendant contends that the trial court erred when it refused to admit into evidence drawings that were made by Brittany Smith, which allegedly depicted the victim as being mean. Finally, the Defendant contends that the trial court improperly admitted into evidence testimony of his co-defendants.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, – S.W.3d –, E2001-00604-SC-R11-CD, 2110 WL 22238947 (Tenn. Sept. 30, 2003). The determination of whether proffered evidence is relevant in accordance with Tennessee Rule of

Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)); State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." See Forbes, 918 S.W.2d at 449. In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000).

After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." James, 81 S.W.3d at 757-58 (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 217 (Tenn. Ct. App. 1999)).

## A. Handcuff Key

The Defendant alleges that the trial court erred when it allowed the State to admit into evidence a handcuff key that was confiscated from him when he was arrested. Tthe New York officer testified that he found the key on the Defendant at the time of arrest and that the key did not open the handcuffs that were found at the scene of the murder. The State claims that the Defendant has waived his right to appeal this issue because he did not object to the key being entered into evidence at trial. However, the record reflects that the Defendant filed a motion in limine to prevent the State from introducing the handcuff key, which the trial court denied.[5] We conclude that the ruling was sufficiently clear that further objection at the trial was not necessary. See Goines v. State, 572 S.W.2d 644, 649 (Tenn. 1978); State v. Gallaher, No. E2001-01876-CCA-R3-CD, 2003 WL 21463017, at *2 (Tenn. Crim. App., at Knoxville, June 25, 2003). The Defendant need not renew

[5]During the pre-trial hearing the Defendant's attorney stated, "And I think I understood the Court ruled that the handcuff key does come in?" and the trial judge responded, "I did."

his objection during the trial to save the issue for appeal; therefore, the Defendant has not waived this issue.

The Defendant asserts that the handcuff key was not relevant pursuant to Tennessee Rule of Evidence 401 and therefore inadmissible pursuant to Tennessee Rule of Evidence 402. Further, the Defendant asserts that, even if relevant, the probative value of the handcuff key was substantially outweighed by the danger of unfair prejudice pursuant to Tennessee Rule of Evidence 403. At the hearing on the Defendant's motion for new trial, the trial court stated:

> I'm going to have to overrule [the admittance of the handcuff key] as a grounds for a motion for new trial. The handcuff key, even though it came at a later time [than the arrest], was relevant. Quite frankly, wasn't it proven at trial that it didn't fit? It cut both ways and I think it was admitted with the understanding that it didn't fit. You all checked it, you know, before it was ever actually introduced. So I felt that it was relevant.

> But then on the other hand, and I realize there are times that items like this could have been offered to be introduced and it would have been improper to do it, but under the facts of this case that's just another piece of evidence. It was something that he possessed at the time. You know, had he possessed let's say marijuana or drugs or something, that might not have been admissible. But under the particular facts of this case it was relevant and should have been admitted and of course was admitted.

The trial court determined that the handcuff key was relevant, and we conclude that the trial court did not abuse its discretion by so determining. Brittany Smith testified that the Defendant was carrying handcuffs when she met him and before he left with Denise Smith in the rental car. Detectives found handcuffs at the scene of the victim's murder. The Defendant was in possession of a handcuff key at the time of his arrest. In light of this, the trial court did not abuse its discretion when it determined that the handcuff key was relevant.

Similarly, we find that the trial court did not abuse its discretion when it determined that the probative value of the handcuff key was not substantially outweighed by its prejudicial effect. As the trial court noted, the handcuff key found on the Defendant did not fit the handcuffs that were found at the scene of the crime. The trial court accurately stated that this evidence "cut both ways." Therefore, we conclude that this issue is without merit.

## B. Pictures of Tattoos

The Defendant next alleges that the trial court erred when it allowed the State to admit pictures of his tattoos into evidence because this evidence "was not necessary" since "Brittany Smith identified the Defendant from the witness stand without the aid of tattoos." Conversely, the State contends that the trial court properly admitted the pictures, because the pictures "were highly

relevant to demonstrate that Brittany Smith recognized and could accurately identify the Defendant." The trial court found that the photographs were relevant and admissible, stating, "I don't know that I can even say that they were prejudicial . . . ."

To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); Gallaher, 2003 WL 21463017, at *2. The determination of the admissibility of photographs lies within the sound discretion of the trial court. Gallaher, 2003 WL 21463017, at *2. Before any photograph can be admitted into evidence it must be verified and authenticated by a witness with knowledge of the facts. Banks, 564 S.W.2d at 949-50.

The trial court's discretion to allow a jury to "view certain aspects of an individual's physical appearance, such as tattoos or scars" is recognized in 3 Warton's Criminal Evidence § 16:20 (15th ed. 1999). See State v. Henderson, No. W2000-00607-CCA-R3-CD, 2001 WL 912759 (Tenn. Crim. App., at Jackson, Aug. 10, 2001), perm. app. denied (Feb. 11, 2002) (holding that did not violate the defendant's constitutional rights when it required the defendant to display his teeth to the jury); see also State v. Henderson, 623 S.W.2d 638, 641 (Tenn. Crim. App. 1981) (holding that the trial judge's forcing the defendant to display to the jury a distinctive tattoo on his arm did not violate the defendant's Fifth Amendment right against self-incrimination); Black v. State, 479 S.W.2d 656, 658 (Tenn. Crim. App. 1972) (holding that the trial court did not err when it required the defendant to stand up before the jury to present a front and side view that revealed a disfigurement that was previously referred to by a witness).

While the cases cited above address whether compelling a defendant to reveal a scar or tattoo violates a defendant's constitutional right against self-incrimination, we find that they are instructive to our holding in the case under submission because in none of these cases was it considered inflammatory, cumulative or unnecessary to compel the defendant to reveal tattoos or scars. In fact, in all of these cases, the evidence was considered relevant and admissible. Similarly, the photographs of the Defendant's tattoos were both relevant and admissible. The evidence in this case was purely circumstantial, and one of the issues was whether Brittany Smith correctly identified the Defendant. Brittany Smith testified that she noticed the Defendant's tattoos upon first meeting the Defendant, and she described those tattoos to the jury. Therefore, the photographs of the tattoos were highly relevant to Brittany Smith's credibility and to her identification of the Defendant. Further, in light of the many cases that hold that this evidence does not violate the Defendant's constitutional rights, we find that this evidence is not unduly prejudicial. Accordingly, we conclude that trial court did not abuse its discretion by admitting the photographs of the Defendant's tattoos.

### C. Brittany Smith's drawings

The Defendant contends that the trial court erred when it refused to allow him access to the file that the Department of Children's Services created prior to Debbie Smith's divorce from the victim because "if there is evidence in that file which would reflect on the credibility of Brittany

Smith, then [the Defendant] should be entitled to that and should have been entitled to that at the time of trial." The file contained some pictures that Brittany Smith drew before the divorce. The Defendant also contends that it was error for the trial court to not allow the "introduction of the findings of the divorce court as it related to allegations that Brittany [Smith] made . . . ." In his brief, the Defendant makes no citations to the record and, accordingly, has waived this issue pursuant to Tennessee Rule of Criminal Procedure 10(b).

Assuming the Defendant did not waived this issue, it is without merit. The trial court reviewed the records *in camera* and determined that nothing contained therein was in any way relevant to Brittany Smith's credibility or any other issue at trial. After thoroughly reviewing the records, we agree with the trial court that they contain no relevant evidence and, pursuant to Tennessee Rule of Evidence 401, the trial court did not abuse its discretion when it determined that the evidence was inadmissible. Accordingly, we conclude that this issue is without merit.

### D. Statements of Co-defendants

The Defendant contends that the trial court erred when it allowed the State to admit evidence that Denice Smith and Deborah Graham made statements to various witnesses that they would kill the victim or have the victim killed, including statements made to: Sharon Jarvis; Sandra Strange; Christine Loveday; and Martin Giovi. The trial court determined that these statements were hearsay, but that they were admissible pursuant to Tennessee Rule of Evidence 803(3), which is commonly referred to as the "state of mind" exception. On appeal, the State concedes that it was error for this testimony to be admitted pursuant to Rule 803(3) relying on State v. Long, 45 S.W.3d 611 (Tenn. Crim. App. 2000), but contends that the testimony was admissible as admissions by a party-opponent, pursuant to Tennessee Rule of Evidence 803(1.2). We agree with the State on both accounts.

The Defendant objects to the testimony of Jarvis, Strange, Loveday and Giovi, based upon hearsay grounds. The respective statements of the respective witnesses are as follows: (1) Jarvis's testimony that, sometime between June of 1996 and August of 1996, Denice Smith told her that she was concerned that the victim would get custody of the children and, on three occasions, told her that, if the victim did get custody, she would kill him; (2) Strange's testimony that, sometime between May of 1997 and July of 1997, Denice Smith inquired whether Strange "knew anybody [who] could do a job for her? And I asked her what kind of job that she wanted done, and she said that she would like to have [her] husband taken care of . . ."; (3) Loveday's testimony that Denice Smith told her, on more than one occasion, that if her husband ever got custody of the children, she would kill him or have him killed; and (4) Giovi's testimony that Deborah Graham requested that he "go down there and kill" the victim on three or four occasions between 1994 and 1995.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A hearsay statement is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. The trial court admitted the statements pursuant to the so called "state of mind"

exception to the hearsay rule found in Tennessee Rule of Evidence 803(3). The State properly concedes, and we hold, that this was error. The state of mind exception can only be used to show the declarant's conduct. Tenn. R. Evid. 803(3). This Court has concluded:

> Only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception. If the statement had been admitted solely to prove [the declarant's] conduct . . . the statement would have been admissible. However, it is clear that the statement was entered to prove Defendant's conduct, not [the declarant's] and for this reason, should not have been admitted.

Long, 45 S.W.3d at 623; see Tenn. R. Evid. 803(3), Advisory Commission Comments. In the case under submission, it is clear that the State offered the testimony of these four witnesses to prove that Denice Smith and Deborah Graham did, in fact, hire or secure the Defendant to kill the victim. Therefore, this evidence was not properly admissible pursuant to the state of mind exception.

While the State concedes this error, it contends that the aforementioned statements fall into another exception, that of "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." See Tenn. R. Evid. 803(1.2)(E). The rationale for this exception is the principle of agency, under which each conspirator is bound to the actions and statements made by other conspirators during the course of and in furtherance of a common purpose. State v. Henry, 33 S.W.3d 797, 801 (Tenn. 2000) (citing Tennessee Law of Evidence § 803(1.2).6, at 521 (3rd ed. 1995)). The Tennessee Supreme Court stated that:

> [F]or a statement to be admissible under this exception, the prosecution must establish: 1) that there is evidence of the existence of a conspiracy and the connection of the declarant and the defendant to that conspiracy; 2) that the declaration was made during the pendency of the conspiracy; and 3) that the declaration was made in furtherance of the conspiracy.

Id. at 801-02. These requirements must be established by a preponderance of the evidence. State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993). If a conspiracy is shown to exist, the co-conspirator's statement is admissible even though no conspiracy has been formally charged. State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981); see State v. Alley, 968 S.W.2d 314 316 (Tenn. Crim. App. 1997).

### 1. Evidence of Existence of Conspiracy

We must first determine whether the State established by a preponderance of the evidence the existence of a conspiracy and the connection of the declarants, here Denice Smith and Deborah Graham, and the Defendant. A conspiracy is defined as "a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means." State v. Carruthers, 35 S.W.3d 516, 555 (Tenn. 2000) (citing Alley, 968 S.W.2d at 316; State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim.

App. 1984); Lequire, 634 S.W.2d at 612). The State only has to show an implied understanding between the parties, not formal words or a written agreement, in order to prove a conspiracy. Gaylor, 862 S.W.2d at 553. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprises." Id.

We find that the State proved the existence of a conspiracy and established the connection between Denice Smith and Deborah Graham and the Defendant. There was ample evidence that Denice Smith and Deborah Graham both sought to have the victim killed and that Deborah Graham was soliciting someone to kill the victim for her sister as early as 1995. The Defendant was seen "riding around" with Deborah Graham in the summer before the victim's murder. Eight days prior to the murder, a package containing drugs was mailed to the victim from a post office 300 yards from the Defendant's home and contained Deborah Graham's fingerprints. Upon leaving Tennessee, Denice Smith went to Florida, where Deborah Graham was living and where she had befriended the Defendant. After meeting with Denice Smith and Deborah Graham, the Defendant left with Deborah Graham for a couple of days and, when he returned, he met with Denice Smith and Deborah Graham and told Denice Smith that "we've killed someone." It is clear from this evidence that, by a preponderance of the evidence, the State established that evidence of a conspiracy existed as early as 1995 and established the connection of Deborah Graham, Denice Smith and the Defendant to the conspiracy.

## 2. Declaration Made During Pendency of Conspiracy

Next, we must determine whether the State established by a preponderance of the evidence that the statements at issue were made during the pendency of the conspiracy. For a statement of a co-conspirator to be admissible:

> [I]t must have been made "during the course of" the conspiracy which means that the conspiracy must have been ongoing at the time the statement was made. If the conspiracy had not yet begun or had ended when the statement was made, the declaration is not admissible under this hearsay exception, although it may still be admissible under some other exception.

State v. Walker, 910 S.W.2d 381, 385 (Tenn. 1995). "Where a conspiracy exists, 'everyone entering into the conspiracy is a party to every act which has before been done by the others and to every act by the others afterward in furtherance of the common design.'" Carruthers, 35 S.W.3d at 556 (citing Owens v. State, 84 Tenn. 1, 4 (1885)). "All acts or declarations of conspirators, or of any of them, may be given in evidence against all, from the time the conspiracy had its origin until its design has been consummated, or until it is abandoned." Owens, 84 Tenn. at 1.

We find that the State proved by a preponderance of the evidence that all four statements to which the Defendant objects were made during the pendency of the conspiracy between Denice Smith and Deborah Graham. At the time that Deborah Graham requested that Giovi kill the victim, Deborah Graham was living in New York, and the stories of the victim's abuse were relayed to her

by Denice Smith. Further, from subsequent events, we can infer that it was upon Denice Smith's request that Deborah Graham attempted to find someone to murder the victim.

While it is clear each of the statements were made during the pendency of the conspiracy between Denice Smith and Deborah Graham, the question remains whether the Defendant is responsible for statements made during the pendency of the conspiracy, but prior to his joining the conspiracy. Using the holding in Carruthers as guidance, we hold that everyone entering into the conspiracy is a party to every statement, as well as act, which has been done before by the others in furtherance of the conspiracy. This holding accords with holdings of other courts interpreting the federal counterpart to Tennessee Rule of Evidence 803(1.2)(E) and other similar state rules of evidence. See United States v. Cassity, 631 F.2d 461, 464 (6th Cir.1980) (adopting the holding articulated in United States v. United States Gypsum Co., 33 U.S. 364, 393 (1948) that "[w]ith the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy"); United States v. Rocha, 916 F.2d 219, 240 (5th Cir. 1990) (holding that any statements of the defendants co-defendants made in furtherance of a conspiracy in which the defendant was a participant were admissible, including statements made before the defendant joined the conspiracy since there was evidence of the defendant's subsequent knowledge and willingness to participate in the conspiracy); United States v. Brown, 755 F.Supp. 942, 946 (D. Colo. 1991) (holding that "[Federal Rule of Evidence] 801(d)(2)(E) permits admission of co-conspirator statements against a defendant who joins the conspiracy after the statements are made"); People v. Beck, 593 P.2d 371, 373 (Colo. App. 1979) (holding that "[t]he acts and declarations of co-conspirators, even those occurring prior to a defendant's involvement, may be admitted against the defendant"). Accordingly, we find that the statements to which the Defendant objects were made during the pendency of the conspiracy between Denice Smith and Deborah Graham and, even though the Defendant did not join the conspiracy until after the statements were made, he is responsible for them since there was evidence of his subsequent knowledge and willingness to participate in the conspiracy.

### 3. Declaration in Furtherance of Conspiracy

As we have determined that all four statements meet the first two prongs of the test, we must now decide whether the statements were made "in furtherance of" the conspiracy. To be in furtherance of the conspiracy, the statement must be one that will advance or aid the conspiracy in some way. State v. Heflin, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999). In Carruthers, the court explained that:

> [A] statement may be in furtherance of the conspiracy in countless ways. Examples included statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project. While such statements are ordinarily made to other conspirators, Rule 803(1.2)(E) does not

-26-

so require. Statements to third parties may qualify if in furtherance of the conspiracy.

Carruthers, 35 S.W.3d at 555-56 (citing Tennessee Law of Evidence, § 803(1.2)(6), p. 552). Casual conversations are not made "in furtherance of" the conspiracy unless they somehow advance the objectives of the conspiracy. State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994).

We conclude that Denice Smith's inquiry of Strange about whether Strange "knew anybody [who] could do a job for her? And I asked her what kind of job that she wanted done, and she said that she would like to have [her] husband taken care of . . .," and Deborah Graham's request that Giovi "go down there and kill [the victim]" were both in furtherance of the conspiracy. The aim of the conspiracy was to kill the victim, and the sisters attempted to achieve this end by procuring someone to kill the victim. The evidence indicated that, after a period of searching for someone to commit the murder, the sisters successfully retained the services of the Defendant, who the jury found killed the victim. The sisters' prior statements attempting to locate someone to kill the victim were both in furtherance of the conspiracy that the Defendant later joined.

Conversely, we conclude that the statements made by Denice Smith to Jarvis and Loveday to the effect that if the victim got custody of the children she would kill him or have him killed were not in furtherance of the conspiracy. Denice Smith's statements were merely a declaration of her intent that did absolutely nothing to advance or aid the conspiracy in any way. Indeed, these statements appear to be a part of a casual conversation rather than an attempt to further the conspiracy. Thus, we agree with the Defendant that the trial court erred when it allowed Jarvis and Loveday to testify about Denice Smith's statements. However, we conclude that this error is harmless in light of the fact that the testimony of Strange and Giovi was admissible and was nearly identical and even more condemning.

## IV. Prosecutorial Misconduct

The Defendant contends that the prosecutor made two improper statements to the jury in his closing argument. First, the Defendant contends that the prosecutor gave the jury an incorrect definition of "reasonable doubt." Second, the Defendant contends that the prosecutor improperly informed the jury that it did not matter whether the Defendant committed the murder, as long as the Defendant was "sitting in the car."

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)); State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." Terry, 46 S.W.3d at 156 (citing Sutton, 562 S.W.2d at 823); see Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975); Goltz, 111 S.W.3d at 5. This Court has explained that "[closing] arguments must be temperate, based upon the evidence

introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Goltz, 111 S.W.3d at 5 (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

When an appellate court finds an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." Goltz, 111 S.W.3d at 5 (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In Goltz, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN.CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).
3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).
4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).
5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

The Defendant first contends that the prosecutor made an improper statement by incorrectly defining "reasonable doubt" in his closing argument. However, the Defendant failed to object to this

particular comment at trial and did not raise this issue in his motion for new trial.[6]  Therefore, the Defendant has waived this issue on appeal.  Tenn. R. App. P. 3(e) and 36(a); State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995).  Even if we were to consider this issue, we conclude that it lacks merit.  At the end of the his closing argument, the prosecutor stated the following:

> His Honor's going to charge you that when looking at this proof and deciding guilt or innocence, you must decide, in deciding whether or not there's reasonable doubt, is whether or not the mind can rest easily upon the certainty of guilt.  Well, I humbly submit to you that in the face of all of this proof, that if you decide to turn this man loose and let him walk away, that your minds will never rest easy.  Thank you.

After thoroughly reviewing the prosecutor's closing argument, we conclude that the prosecutor's comment about "reasonable doubt" was not improper.  The prosecutor based his comment upon the definition of "reasonable doubt" found in the jury instructions.  The trial court gave the jury the following instruction regarding reasonable doubt:  "Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily as to the certainty of guilt. . . ."  The Defendant did not object to this jury instruction at trial.  We conclude that the prosecutor's comment clearly conforms to this "reasonable doubt" jury instruction, and the trial court did not abuse its discretion by allowing the prosecutor to make this comment.

Next, the Defendant contends that the prosecutor improperly informed the jury that it did not matter whether the Defendant committed the murder, as long as the Defendant was "sitting in the car."  The prosecutor made the following statement in his closing argument:

> Any doubt in anybody's mind, I submit to you, but that Deborah Graham was involved in this murder?  Any doubt?  It's uncontradicted.  She told her boyfriend Marty Giovi of her involvement in this murder.  It's uncontradicted that she came up here to Tennessee and went back in that white Buick.  And it's uncontradicted that this man came with her.  And there was no other explanation that's come from that witness stand as to why he was with her.  And the only reasonable explanation could be it was to come up here and take care of Aaron Smith.  And it didn't matter if he was in there and pulled the trigger, it didn't matter if he was sitting out in the car.  But he sure as heck wasn't in Gatlinburg.  There's absolutely no proof on this stand coming in here and telling you he was ever in Gatlinburg. . . .

We conclude that the prosecutor's comment in this instance was not improper.  The prosecutor argued that the Defendant was guilty of first degree murder, whether he "pulled the trigger" or was "sitting out in the car."  Indeed, such an argument is consistent with the State's theory that the

---

[6]The Defendant's attorney only objected to the prosecutor's alleged comments about the Defendant not testifying and his comments about how the Defendant was guilty, whether he pulled the trigger or was just sitting in the car.

Defendant conspired with Denice Smith and Deborah Graham to kill the victim because the victim obtained custody of his children. The State's theory was that the Defendant was criminally responsible as a party to first degree murder if the murder was committed by the Defendant's own conduct, by the conduct of another for which the Defendant was criminally responsible, or by both. The trial court gave extensive instructions regarding "criminal responsibility." We conclude that the prosecutor's comment was consistent with the trial court's jury instructions. Accordingly, we conclude that the trial court did not abuse its discretion by allowing the prosecutor to make this comment.

## V. Sufficiency of the Evidence

The Defendant contends that the trial court erred when it refused to grant his request for a judgment of acquittal because the evidence was insufficient to sustain a conviction. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented in this case for a rational jury to convict the Defendant of first degree murder pursuant to Tennessee Code Annotated section 39-13-202. That code section states: "First degree murder is: (1) A premeditated and intentional killing of another; (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of . . . robbery, burglary, theft, kidnapping . . . ." Tenn. Code Ann. 39-13-202. The evidence presented, while primarily circumstantial, was sufficient for this conviction.

The two sisters, Denice Smith and Deborah Graham, were heard to say that they wanted Denice Smith's husband killed. Deborah Graham requested that her boyfriend kill Denice Smith's

husband, and Denice Smith inquired about finding someone to kill the victim for her. Denice Smith's husband then got custody of their children, and she fled with the children to Florida whereupon she met with, among others, Deborah Graham and the Defendant in the presence of her children. Brittany Smith, Denice Smith's daughter, identified the Defendant in court as the man present at this meeting and described the Defendant's tattoos. A short time after the meeting, Deborah Graham and the Defendant left in a rental car for a few days. While driving this rental car on the day of the murder, the Defendant was stopped and cited for speeding in Tennessee. When Deborah Graham and the Defendant returned to Florida, Brittany Smith heard the Defendant say that "we've killed someone." The Defendant pawned jewelry at a pawn shop that was later identified to be jewelry taken from the victim's home. When questioned by police about his trip in the rental car with Deborah Graham, the Defendant stated that the couple went to Detroit, but according to the mileage on the rental car, such a trip was impossible. However, the mileage on the rental car was consistent with a round trip to the victim's home and back to Florida. We conclude that this circumstantial evidence is sufficient to convict the Defendant of first degree murder.

## VI. Trial Court's Instructions

The Defendant contends that the trial court erred when it instructed the jury by: (1) giving the jury a flight instruction; (2) instructing the jury on the criminal responsibility of another; and (3) improperly stating "if [the Defendant] had been proved guilty say so."

## A. Flight Instruction

The Defendant contends that the trial court erred when it gave a jury instruction on flight because there was no evidence of flight, rather "the evidence was that [the Defendant] was present in Tennessee and removed himself from the State of Tennessee by returning to Miami, Florida where he lived. At a later point in time, [the Defendant] removed himself from Miami to New York, where he had previously lived." The Defendant in his brief makes no citations to the record and the issue is, therefore, waived. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7). However, even had the Defendant not waived this issue, it is without merit.

The trial court instructed the jury that:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination. The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried or concealed departure or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community or a leaving of the community for parts unknown to constitute flight. If flight is proved, the fact of flight alone does not

-31-

allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight if flight is so proven together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reasons for it and the weight to be given to it are questions for you to determine.

This instruction is taken verbatim from the Tennessee Pattern Jury Instructions. See 7 Tenn. Practice, Tenn. Pattern Jury Inst.–Criminal 42.18 (5th ed. 2000). This pattern jury instruction is a correct statement of the applicable law and has been previously cited with approval by our court. See, e.g., State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996). In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. There is sufficient evidence to support a jury charge on flight where there is proof of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or leaving the community for parts unknown." State v. Burns, 979 S.W.2d 279, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)); State v. Franks, No. W2003-0003-CCA-R3-CD, 2003 WL 22351024 (Tenn. Crim. App., at Jackson, Oct. 14, 2003), *perm. app. filed* (Nov. 13, 2003).

In the case under submission, there is sufficient evidence for the trial court to instruct on flight. LaShawn Taylor, the mother of the Defendant's son and long-time girlfriend, testified that, after she and the Defendant were stopped by the police and the Defendant spoke with the police, he came to her work place and got her car. Taylor further stated that, at the end of her work day, the Defendant picked her up and took her to her mother's house. Taylor testified that the Defendant left her at her mother's house and said he would be "right back," but he never returned. The next time she saw the Defendant was the day of trial, but she had spoken with him and told him the police were looking for him. From this testimony, it is clear that there was proof that the Defendant left the scene of his "difficulty" and did not return, even though he knew that the police were looking for him. We conclude this evidence was more than sufficient to support the flight instruction.

### B. Criminal Responsibility of Another Instruction

The Defendant also contends that the trial court erred when it instructed the jury on criminal responsibility of another because "there was simply no evidence to show that [the Defendant] was involved in the crime in any way." The Defendant again makes no citations to the record and, accordingly, the issue is waived. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7). However, even had the Defendant not waived this issue, it is without merit.

The trial court instructed the jury:

-32-

The defendant is criminally responsible as a party to the offense of First Degree Murder if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible or by both. Each party to the offense may be charged with the commission of the offense. The defendant is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense the defendant solicits, directs, aids or attempts to aid another person to commit the offense.

Before you find the defendant guilty of being criminally responsible for said offense committed by the conduct of another, you must find that all the essential elements of said offense have been proven by the State beyond a reasonable doubt.

This instruction accords with the law of this state. Tenn. Code Ann. §§ 39-11-401, -402 (2003). Criminal responsibility is not a separate crime. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). "It is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." Id. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principle in the first degree.'" State v. Maxey, 898 S.W.2d 755, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)); see State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 1999).

In the case under submission, it is clear that the evidence was sufficient for the trial court to instruct the jury on criminal responsibility. While it was unknown who fatally shot the victim because there were no eyewitnesses to the crime, the circumstantial evidence showed that the Defendant actively participated in the crime. First, the Defendant drove Deborah Graham in the vehicle while in Tennessee, as evidenced by his speeding ticket. Second, Brittany Smith heard the Defendant say, "We've killed someone." This evidence was sufficient to warrant an instruction on criminal responsibility.

## C. Instruction on Return of Jury's Verdict

The Defendant also contends that the trial court erred when it instructed the jury on the return of the jury's verdict. In its entirety, the Defendant's brief states:

[The Defendant] insists that the trial court erred in giving an instruction as to what to do if the jury found him guilty, but not stating in that same instruction what to do if the jury found him not guilty. "It is the duty of the trial court to give a complete charge of the law applicable to the facts of the case."

The Defendant again makes no citations to the record and, accordingly, the issue is waived. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7). However, even had the Defendant not waived this issue, it is without merit.

The trial court instructed the jury as follows: "If [the Defendant] has been proved guilty, say so, keeping constantly in mind that it would violate your sworn duty to base any verdict on anything but the evidence and the law in this particular case." The trial court also instructed the jury that:

> As I told you before at the very beginning of this case, it isn't a question of whether the State of Tennessee wins or loses a case, because ladies and gentlemen, our state always wins when justice is done regardless of whether the verdict of the Jury is guilty or not.

We conclude that, from these instructions, the jury was clearly aware of its duty and was in no way encouraged by the trial court's instructions to return a guilty verdict. Therefore, we conclude that this issue is without merit.

## VI. Witnesses in Courtroom

The Defendant contends that the trial court erred when it allowed "Cletus Smith[7] and Robert Caldwell to remain in the courtroom during the trial." However, the Defendant does not provide any citations to the record or to any legal authority to support his contention. Therefore, we find that he waived this issue on appeal. Tenn. R. Crim. P. 10(b); see also Tenn. R. App. P. 27(a)(7). Further, this issue is simply without merit. Cleta Smith was the victim's mother, and the prosecution designated her as a party for the victim. Tennessee Rule of Evidence 615, which allows for the exclusion of witnesses at trial, clearly states that "this rule does not authorize exclusion of . . . a person designated by counsel for a party that is not a natural person." The other witness to which the Defendant objects is Robert Caldwell, the investigating officer. Caldwell was excluded from trial, but the Defendant objects to his being allowed to sit at the prosecutor's table during voir dire when he was "not the prosecutor." The Defendant has cited no legal authority for his position and it is simply without merit.

Accordingly, we find that there was no reversible error in the judgments of the trial court and the trial court is, therefore, AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[7]We assume that the Defendant is referring to the victim's mother Cleta Smith as there is no evidence of a "Cletus Smith" present at trial.